Thank you, Your Honor. May it please the Court, my name is Richard Min, and I represent Appellant Ms. Catherine Patricia Martin in this matter, which is brought pursuant to the Hague Convention on the Civil Aspects of International Child Abduction. The decision in this case required the return of a two-year-old child to Spain as requested by his abusive father, Mr. Grano, despite the father's, the Court's, finding that the father had a long history of domestic violence towards Ms. Martin and witnessed by the child. I have reserved two minutes for rebuttal, and I wanted to address three central issues in this case, the first one being the question of habitual residence, the second question being the issue of grave risk of psychological harm to the child if returned to Spain, and the third issue being the one of undertakings to protect the child if the Court requires that the child return to Spain. On the issue of habitual residence, on February 25th of this year, the United States Supreme Court, for the first time in the case of Manaski v. Cagliari, addressed the issue of habitual residence and gave uniform interpretation across this country as to how to address that question, and stated that a child's habitual residence depends on the totality of the circumstances specific to a case. We believe, and we contend, that the District Court did not apply that totality of the circumstances test to this particular case. Now, how can you say that? Originally, it did not. Then, when the Supreme Court case came down, it asked for additional briefing on it, and then, in its opinion, it talked about the totality of the circumstances. I mean, I've seen much of your argument, but that part really troubled me, because it seemed to me that the Court did exactly what, in terms of paying attention to the Supreme Court. Now, on the merits of the thing, the Supreme Court puts more weight on facts and requires us to be more deferential to the District Court, does it not? So, I don't see how the Supreme Court stepping in, frankly, helps you. I think it's just, technically, on this point, it cuts the other way, doesn't it? Judge Calabresi, you're absolutely correct. Of course, the standard review is now very deferential to the District Court's finding of facts. We do argue that the District Court made several central findings of facts that were a clear error in this case, especially its central finding, which is that, in July 2017, the parties shared an agreement to return to Spain with the child unconditionally. Now, that finding of facts, which was central to the District Court's ultimate conclusion that their official residence was Spain, also goes to the misapplication of the totality of the circumstances test, because, although I agree that the District Court decision referenced the totality of the circumstances test as described in Menaski, its analysis clearly did not apply that test to the facts of this that there was an agreement, whether it was unconditional or not is a separate question, but that there was an agreement that they were going to try it living in Spain. They bought a house. She registered the child at the City Hall in the town in Spain. She didn't retain any bank accounts in the United States. They were looking at schools to enroll the child in, and don't all those facts support the District Court's conclusion that the habitual residence was intended to be in Spain? Yes. I mean, Judge String, of course, those factors, if you look at them independently, those are factors that would weigh in favor of finding that Spain is the child's habitual residence. I don't can't contest that, except for the fact that... What do you have on the other side that suggests the habitual residence was New York? Well, number one, the conditional nature of the move, I think, is certainly central to this case. I think common sense is a plain reading of the parties' continued negotiations through the summer and the fall of 2017 in communicating when and how the child would be returned, and what the nature of their relationship would be upon their return is critical in analyzing what Ms. Martin's intention was when she went back. And the actions that Ms. Martin took when the child was returned to Spain, in enrolling the child as a resident of Spain, in buying a house, which she didn't actually buy the house. All she did was sign a document allowing Mr. Grano to obtain a mortgage. The house is in Mr. Grano's name alone. He paid for the house. She has no right to that house. The only thing she signed was the document that allowed him to obtain a mortgage. Otherwise, he would not have been able to purchase that home. So, all of those actions were also in the context of the coercive control nature of their relationship. And this was a mother who had been subjected to years of psychological abuse by Mr. Grano that culminated in an incident of physical abuse. And all of the actions she took, even the district court talked about the fact that register the child, putting pressure on her to return to Spain before her friend came to visit, putting pressure on her to induce the birth of the child when he was visiting in New York, so he wouldn't miss the child's birth. And even the district court was pointing out the fact that Mr. Grano was attempting to manipulate her during the trial and influence her testimony. I mean, this is the extent of the... Can I interrupt for a minute, please? I was interested to read the case of Suratgar, we decided in 2013, and similar claims of domestic abuse and concerning claims were raised. And yet, we found that the grave risk of harm exception and human rights exceptions didn't apply, that there was inadequate risk of harm to the child himself. And the circumstances struck me as fairly similar, where there were disputes about exactly what was said and done and so on. Is there anything in your mind, are you familiar with the case? And if so, is there anything in your mind that makes this distinguishable from your situation, distinguishable from that in Suratgar? You have one minute, by the way. Okay, thank you. And yes, Judge Carney, we addressed that in our reply brief, but briefly, I'll just state that there are several distinguishing factors. Number one, in that case, the district court did not find that the mother was coercively controlled by the father. In this case, the district court did find that Ms. Martin was coercively controlled by the father. In that case, the father agreed not to pursue custody claims in the religious courts in Singapore, and rather agreed to pursue custody claims in civil courts. Now, in our case, Mr. Grano has already obtained a temporary order of custody, which means that when the child goes back to Spain, the child will be immediately returned to an abusive father, who the district court recognized in their decision had no experience raising this child and was essentially unfit to mother to Spain is far easier in this case than it was in our 2013 case, where there were questions of apostasy and all sorts of, and yet we held that it was all right. The Spanish courts are, you know, perfectly decent courts. They have a very definite family law section that looks after these, and the district court spoke specifically to those courts. Why isn't that make this case actually a fortiori from our 2013 case? Well, I would also point out the Sadevi-Golan case, which this court addressed last year. And in that case, although there was a finding of great risk, and there was certain distinguishing factors as well, which I of course alluded to, the district court was very proactive in assuring that when the child was returned to Italy, that the child would not be returned into the hands of the abusive spouse, the abusive father, who in that case had a loving, warm relationship with the child. The case was entirely about spousal abuse, but the district court still fearful of its impact on the child, assured before the return of the child that there were orders of protection in place, that the child would only be allowed to visit with the father in a supervised setting, and that the mother would have temporary custody of child during and after the return. In this case, the district court, even though the district court found that Mr. Grana was abusive, and that the child witnessed the abuse, took no action which was within its authority to protect the child upon the return. Ms. Martin, in fact, does not have legal immigration status that would allow her to go back with the child to Spain. So this child is left unprotected. And although we can say that the Spanish courts are able to protect this child, the question within this circuit is not whether the courts in the Mitchell residence could protect the child, but whether they would protect the child. And giving temporary custody of a child to an abusive father does not demonstrate that the Spanish courts are taking the issue of abuse seriously within this case. All right, and I reserve two minutes for a rebuttal. We'll hear from the other side. Good afternoon, your honors. Neil Saltzman, appearing with co-counsel Barry Abbott for appellee, Mr. Sergei Grano. Your honor, I've listened to Mr. Min's arguments. Of course, I've read them and addressed them in our brief. And in reference to the three topics, I'll address the three topics that have been raised by appellants in turn. On the subject of habitual residence, as the court noted, the district court did extensively analyze the range of facts to determine that Spain was the usual and customary home of the child, and therefore, pursuant to Minaski, his habitual residence. As part of that analysis, it investigated the parental intention, which in its own brief, the appellant contended that the court placed too much emphasis on, and then argues that it's a critical factor in the court's decision. It was not a critical factor in the court's decision. It was one of numerous factors in the court's decision, which the district court specifically stated was not dispositive of the issue and relied much more closely, I think, on all of the ancillary or additional circumstances, including Ms. Martin's own efforts to create a foundation for an ongoing permanent home for herself and the child in Spain. The child was roughly a year and a half old when this was going on, right? That's approximately correct, yes. Yeah, I mean, one issue I'm struggling with is the notion of habitual residence for such a young child. I gather the Supreme Court case, the child was even younger, but it's hard to really figure out what is habitual residence when you're talking about someone who's only been around for a year and a half and was actually born in the other country. Right, well, one of the main issues that Minaski was intended to address was the infant cases that previously had reached the these infant children didn't have any country of habitual residence. And the Minaski court, and that is in fact what Ms. Martin argued in this case, until the Minaski decision was issued, at which point she tried to craft an argument by which the United States maybe would be the child's habitual residence without offering any arguments as to how that could possibly be. But the Minaski court wanted to eliminate the possibility of an infant being left with no international kidnapping and leave the left behind parent with no recourse, which is exactly the result that Ms. Martin was hoping for here. So while I understand and the Supreme Court has certainly addressed the nature of infants' relationship to their environment as being perhaps less subjective, we have less of a subjective quality of attachment than an older child. The rule that has been established is simply to determine the child's usual customary home. And when we look and see that the only home that that child had at the time that he was removed from Spain was in Spain and all of the other factors that Your Honor mentioned. Did the district court find that, in a way, that Spain was the habitual residence of both parents and as a result it could be nothing else for such a small child? Or should we ask the district court to make such a finding in the case of so small a child? I think the answer to both, well, the court doesn't, you know, the issue of the term habitual residence is not really, I have not seen it applied specifically to the parent's independence of the child. Where their habitual residence was not relevant under the Gitter test and it's not really relevant today. Relevance is one factor among many, and to use the language of Menaski, merely one factor is what the intention of the parents were. The district court in this case concluded that, in fact, the parents did share an unconditional intent for the child to reside permanently in Spain. That was true at the time of the child's removal and the court, which is the relevant period of time under Article IV of the Hague Convention, and it was based on a wealth of circumstances and facts and in particular actions that Ms. Martin herself took to cement their family's presence in Spain. On the question of whether this was an unconditional agreement, in light of all the circumstances, the difficulties they were having, there were discussions about moving to Nevada, wasn't it implicit that this would depend on how it worked out, on whether indeed they were able to live together as well as a family? Perhaps at one period of time, that would have been a reasonable conclusion to draw, but it's not the relevant period of time. The relevant period of time is the date of the child's removal from Spain, and during the year that preceded it, while Ms. Martin was living in Spain together with the child and Mr. Grano, they took a number of actions which could not really be, are not consonant with an implicit conditional term that we're going to leave. You don't buy a house if you're going to leave. You don't look for a school for a kid with asking questions about their seventh and eighth grade curriculum if you're not intending to stay there, and you don't write messages to Mr. Grano by text saying, you know, I want the kid to stay in Spain and see family in New York, you know, in the summer, every summer, which is, there are messages to that effect, which the court references in its decision. Those things do not go along with an idea of conditionality, and the court rejected it as a matter of fact. That one factor among many that is relevant for an habitual resident, even that factor of intentionality, supports the finding that Spain is the child's country of habitual residents. What about the question of undertakings? I mean, if they do go back, should something be put into place to make sure that this is properly litigated in Spain, or that, what are the arrangements? Will the mother have access? You know, should more thought be given to these undertakings, or whether there should be undertakings? In this case, I do not believe so, and it's for several reasons. One formal, technical, which is that I don't think the court has jurisdiction to demand undertakings once it has determined that there's not a grave risk of harm. Well, there's a circuit split on that question. So, the question is, if we went with both circuits that said we don't have jurisdiction, that's it. If we went with the circuits that say that we do have jurisdiction, then the question is, is that statement one that the court may do that even in those circumstances, or is it that in both circumstances, the district court must do that? And I'm just not just that it may. I can't say definitively that there are no cases which say the court must consider it, because, you know, if you found, if a court, well, let's distinguish the cases. If we're talking about a case where grave risk has been established, the court has to consider it, because you can't deny a return based on grave risk without considering it. The preferred outcome is that the child be returned to a country of habitual residence, and the court is required, before recognizing a grave risk defense, to consider ameliorative measures. That could include some kind of undertaking. Without a grave risk finding, and you're theoretically, Your Honor, that the court has jurisdiction to demand undertakings notwithstanding the back of grave risk, it's absolutely discretionary with the court whether or not to issue one or not. This court considered, the district court, that is, considered the risks alleged, the nature of the scope of the risk, the likelihood of the risk, the credibility of the parties, including a finding that Ms. Martin had fabricated, alleged acts of violence, and concluded, and the Spanish legal system stands ready to protect her. Counsel, to what extent should we read Monasci as going beyond the first issue of habitual residence, that speaking both as to the question of abuse, and to this last question as an indication that the Supreme Court wants these to be highly factual issues in which we should defer to the district court? Is that something that is an appropriate reading of Monasci, or is that stretching that case outside its boundaries? I have one minute. Thank you. I believe that the stronger deference given to the district court's factual findings is a clear lesson to be taken from the Monasci decision, and on the subject of abuse, the Supreme Court also expressed a clear, explicit preference that these issues be explored in the courts of the country of habitual residence, which Ms. Martin is fully capable of taking advantage of in this case. Okay. Thanks very much. We'll hear the rebuttal. Mr. Mintz? Thank you, Judge Strickland. I just want to strike on a couple of issues, the first being the issue of habitual residence for young children, Judge Shin. I think all courts agree that it is a difficult question for young children, especially when the child is born in a cloud of conflict. You know, several cases talk about that in the Ninth Circuit, the ALC case, Holder v. Holder, and even in the Southern District, the Mohopsy-Ripa case that was recently decided, talked about the difficulty determining habitual residence in these types of cases. Monasci does not mandate habitual residence be found. Of course, it's always better if habitual residence can be found. But in this type of case, where the child was young, and to differentiate Monasci, in Monasci, the child was younger, but the child was born and raised until the abduction in one country, in Italy. This is not the case here. The child was born and lived here with the understanding that the child would permanently reside in the U.S. until the parties agreed to back the state. So this differentiates the case from the Monasci case, from other cases. There was a cloud of disagreement here. There was a clear condition. It doesn't have to be an agreement. It can be a unilateral condition. These are all factors within the totality of the circumstances that are important. The court did not consider the common sense approach here, which is that this is a mother who was abused, escaped the abuse to come to the United States to give birth, went back to Spain to her abuser to try to keep her family intact. The abuse escalated. It culminated with an event of physical abuse. She ran and hid in a closet, contacted the Department of State, contacted her friends, contacted social services in Spain, and then left in fear. The idea of undertaking in the Real Rios case, which is a Southern applied undertaking in the Southern district without a finding of a grave risk. There is a circuit split, but we believe that this court should remand to the district court at the very least to analyze the question of undertakings. But the district court in this case said that because there's no grave risk, what kind of an undertaking would you want to see? Well, at the very least, I think there needs to be an agreement that there will be permitted and immigration status given so that she can enter the country and litigate in Spain for custody. Have you tried working these things out with the other side? In other words, giving her the ability to litigate and an agreement on temporary things? No, Your Honor. Well, to be frank, the parties have engaged in settlement discussion. So within that context, there have been discussions about that, not as part of a return order. All right. Why don't you finish up? Why don't you finish up? Yes. So we think the district court in this case specifically said, because there's no grave risk finding, there's no need to discuss Spain's ability to protect the child or potential undertakings and ameliorative measures, which means that the court did not say, well, there's no grave risk. And I find that undertakings are not necessary in this case. They said, we're not even going to consider it because there's no grave risk finding, which we don't believe should be the appropriate standard. But the district court specifically spoke to the courts in Spain and said, talked about custody, talked about those things. And it considered making specific requirements, but judged that in the context of this case, making the statements that it did was adequate. Isn't that right? Well, I think again, but to say that they didn't think about it, it strikes me as odd. Your Honor, Judge Calabresi, of course, I understand the distinction and I for me, the distinction is that the court concentrated on this theoretical idea that the Spanish courts could address issues of domestic violence and custody, where the case law is clear that it's not a theoretical question. It's an actual, it's really that the courts in Spain, not just in theory, but in practical reality, have to make efforts to protect the child. Of course, we recognize that most courts, Spanish courts, Italian courts, other foreign jurisdictions have legal systems in place to protect children from domestic violence. The question is, are they making efforts to actually protect this child from the effects of domestic violence? And it's clear when they give custody, temporary custody to an abusive father, that they are not actually making efforts to protect this child. And that's what the court needs to investigate. And that's what the court needs to analyze. And we don't believe the court properly did that. All right. Thank you. We will reserve decision. We'll move on to the next